# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 10-2922

JOHN DOE, 3, a minor by DOE 3'S
next best friend DOE 2, et al.,

*Plaintiffs-Appellants,*

*v.*

ELMBROOK SCHOOL DISTRICT,
Elmbrook Joint Common
School District No. 21,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 09-cv-409—**Charles N. Clevert, Jr.**, *Chief Judge*.

REARGUED EN BANC FEBRUARY 9, 2012—DECIDED JULY 23, 2012

Before EASTERBROOK, *Chief Judge*, and POSNER, FLAUM,
RIPPLE, KANNE, WOOD, WILLIAMS, SYKES, TINDER, and
HAMILTON, *Circuit Judges*.[*]

———

[*] Circuit Judge Rovner took no part in the consideration or
decision of this case.

FLAUM, *Circuit Judge.* A group of past and present students and their parents (collectively, the "Does") brought this action against the School District of Elmbrook (the "District"), claiming that the District's practice of holding high school graduations and related ceremonies at a non-denominational, evangelical Christian church was violative of the Establishment Clause of the Constitution of the United States. For redress, the Does sought injunctive, declaratory, and monetary relief. After denying the Does' motions for a preliminary injunction and for summary judgment, the lower court granted the District's motion for summary judgment, finding that the District did not act unconstitutionally when it held secular high school ceremonies at Elmbrook Church (the "Church"). The Does appealed.

Prior to being presented to our en banc Court, the Does' appeal was heard by a three-judge panel, which produced a majority opinion with three holdings, of which two were unanimous. *Does v. Elmbrook Sch. Dist.*, 658 F.3d 710 (7th Cir. 2011) (*vacated* Nov. 17, 2011). The panel first concluded that the Does' case is justiciable, despite the District's cessation of holding high school ceremonies at the Church. Next, the panel determined that the district court did not err in allowing the Does to proceed anonymously. Finally, a majority decided that the District's use of the Church did not violate the Establishment Clause. We adopt the panel's original analysis on the issues of justiciability and anonymity and confine our discussion to whether the District's actions were constitutional under the First Amendment's Establishment Clause. Our conclusion is that the public

school graduation ceremonies at issue, which took place in the sanctuary of a non-denominational Christian church, violated the Constitution.

Before advancing the reasoning behind our decision, it is important to note the limited scope of this opinion. The ruling should not be construed as a broad statement about the propriety of governmental use of church-owned facilities. Rather, the holding is a narrowly focused one, as it must be under our Supreme Court's jurisprudence. *See McCreary Cnty. Kentucky v. ACLU of Kentucky,* 545 U.S. 844, 867 (2005) ("[U]nder the Establishment Clause detail is key."); *Lee v. Weisman,* 505 U.S. 577, 597 (1992) ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one . . . ."); *Lynch v. Donnelly*, 465 U.S. 668, 694 (1984) (O'Connor, J., concurring) ("Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion."). *See also Cohen v. City of Des Plaines,* 8 F.3d 484, 489 (7th Cir. 1993) (citing *Lynch*, 465 U.S. at 678) ("[O]ur inquiry . . . under the [Establishment Clause] necessarily 'calls for line-drawing; no fixed, per se rule can be framed.' "); *Cooper v. U.S. Postal Service*, 577 F.3d 479, 494 (2d Cir. 2009) ("The fact that a [Contract postal unit] is located in a religious facility . . . does not offend the Establishment Clause. Any violation must arise from the specific conditions of [the defendant's] structure and space, and its religious displays.").

Nor should this opinion be read as critical of the cases permitting governmental use, in the proper

context, of certain church-owned facilities. S*ee, e.g., Otero v. State Election Bd. of Oklahoma,* 975 F.2d 738 (10th Cir. 1992) (holding that the Establishment Clause does not bar the use of churches as polling places in state and municipal elections); *Porta v. Klagholz*, 19 F.Supp.2d 290, 302-04 (D.N.J. 1998) (finding that a charter school's use of space on church premises did not violate the Establishment Clause because, inter alia, "[t]here [was] no evidence of any religious iconography in the classroom area or in areas used by [the charter school]."). *But see Spacco v. Bridgewater School Department*, 722 F.Supp. 834 (D.Mass. 1989) (enjoining a school district from assigning two students to classes held in facilities owned by a church, based in part on the need for students to "pass beneath a large cross" to enter the facility and the existence of religious flyers that were confronted upon entry). We do not question the vitality of those decisions; rather, we underscore how this case differs. The difference is one of degree, not kind. When confronted with an Establishment Clause challenge of this nature, the Supreme Court requires us to examine the context in which government interacts with a religious organization. Here, the involvement of minors, the significance of the graduation ceremony, and the conditions of extensive proselytization prove too much for the District's actions to withstand the strictures of the Establishment Clause.

We do not speculate whether and when the sanctuary of a church, or synagogue, or mosque could hold public school ceremonies in a constitutionally appropriate manner. Nor do we seek to determine whether and when *this* sanctuary, or one akin to it, could be properly used as the

setting for a graduation under other circumstances. For example, if a church sanctuary were the only meeting place left in a small community ravaged by a natural disaster, we would confront a very different case. It is not our charge to consider the myriad alterations to the factual scenario before us in an attempt to determine what circumstances could have rendered the District's practice constitutional. Rather, our duty is to consider the set of facts before us, and on those facts, we conclude that an unacceptable amount of religious endorsement and coercion occurred when the District held important civil ceremonies in the proselytizing environment of Elmbrook Church.

## I. Background

### A. Facts

#### 1. The District

The District is a municipal public school district centered around Brookfield, Wisconsin, a suburb to the west of Milwaukee. Its two major high schools are Brookfield Central and Brookfield East. For part of the last decade or so, Central and East have held their high school graduation ceremonies in the main sanctuary of Elmbrook Church,[1] a local Christian evangelical and

---

[1] The Does refer to the room in which the ceremonies were held as the "sanctuary," but the District insists that it actually is called the "auditorium" and that it is labeled as such. Both

(continued...)

non-denominational religious institution. Central began the practice in 2000, and East followed in 2002; both schools rented the Church for graduation every year thereafter through 2009. For at least some years since 2003, Central also rented the Church's chapel, a smaller room, for its senior honors night. East rented the Sharon Lynne Wilson Center for the Arts, a secular facility, for its honors night.

The impetus to move Central's graduation to the Church appears to have come from the student officers of the senior class of 2000, who believed that the school's gymnasium—the previous venue—was too hot, cramped and uncomfortable. Those attending were packed in; they had to sit on hard wooden bleachers or folding chairs; and there was no air conditioning. Seeking a better alternative, the student officers decided upon the Church, which was much larger than the gymnasium and had more comfortable seats, air conditioning and ample free parking. They presented their idea to District Superintendent Matt Gibson[2] and

---

[1] (...continued)

parties agree that the Church itself refers to the room variously as the "sanctuary," the "Sanctuary/Auditorium" and the "auditorium." It is clear that the room is a religious venue and that "[t]he Church holds its weekend worship services" there.

[2] In September 1999, the senior class officers sent a letter to Superintendent Gibson making their case for the Church:

> We request that the site of the ceremony be changed to an auditorium in Elmbrook Church . . . . As you know, the
>
> (continued...)

then to the senior class, which voted in favor of the proposal. After the vote, Principal Jim Brisco made the ultimate decision to choose the Church, and Superintendent Gibson approved. A similar process began at East two years later, and Principal Joe Schroeder "eventually adopted the proposal, after a majority of seniors voted for it." Until 2005, each year the students in the senior class participated in advisory votes to choose between two or three venues.[3] These preliminary selections were made

---

[2] (...continued)

> graduation ceremony has been held in the Brookfield Central Gymnasium for the past several years. The seating in the Gymnasium is very limited, causing the atmosphere to be very busy and perhaps even chaotic. On top of the crowding, the temperature in the Gymnasium gets extremely hot in the month of June. We feel that the Elmbrook Church will overcome the limitations of space and temperature control, providing ample comfortable seating and an air-conditioned room. The cushioned seats are also much more comfortable in comparison to the hard, wooden bleachers available at school. In addition, there are more than enough parking spaces and excellent handicap facilities available at the Church.

There is no information in the record about how the senior class officers first learned of the Church or its amenities.

[3] Other, secular graduation sites that have been suggested to the District include the School gym and football fields, the Sharon Lynne Wilson Center for the Arts, Carroll University's Shattuck Auditorium, Milwaukee Area Technical College's Cooley

(continued...)

by school officials and senior class officers. The Church was always one of them, and the Church invariably emerged as the overwhelming favorite.[4] In 2006, the principals of East and Central determined that holding a vote for the 2007 graduation venue would be pointless and simply selected the Church after it was recommended to them by the senior class officers of the two schools.

Superintendent Gibson and Tom Gehl, a member of the school board since 2005 and president of the school board since 2009, are both members of the Church. The Does have not alleged that Superintendent Gibson or Board President Gehl have engaged in any efforts to steer graduation ceremonies to the Church, nor do they allege that either of these officials has misused his office to benefit the Church or to form a relationship between the District and the Church. While there is no evidence that either Superintendent Gibson or Board President Gehl influenced or attempted to influence the student vote that resulted in the selection of the Church, Superintendent Gibson ultimately had to approve of the deci-

---

[3] (...continued)
Auditorium, the Pabst Theater in Milwaukee, the Waukesha County Expo Center, the U.S. Cellular Arena in Milwaukee, the Midwest Airlines Center in Milwaukee, and the Wisconsin State Fair Park.

[4] For example, in 2005, ninety percent of seniors at East voted for the Church. Six percent chose the Expo Center, and four percent chose the East gymnasium.

sions made at the school level.[5]

With the exception of Mr. Gibson, who has been Superintendent of the District since 1995, the major players on the District's side have changed. Don LaBonte took over as principal of Central in 2005 after two intervening successors to Mr. Brisco.[6] In the same year, Brett Bowers became principal of East when Mr. Schroeder left.[7] The Church charged a standard rental rate to the District, which ran between $2,000 and $2,200 for each graduation exercise, and between $500 and $700 for honors night. Money raised by the senior class of each school covered part of the rental fees, and the District funded the rest through its general revenues, which come from property taxes.

## 2.  Elmbrook Church

The atmosphere of the Church, both inside and outside the sanctuary, is indisputably and emphatically Christian. Crosses and other religious symbols abound on the Church grounds and the exterior of the Church building,

---

[5]  Superintendent Gibson was also involved in responding to complaints about the District's use of the Church and in coordinating certain aspects of the rental arrangement with Church officials.

[6]  Mr. Brisco was principal of Central from 1996 to 2002. Two other principals, each with a tenure of a year, succeeded him before Mr. LaBonte's appointment to the position.

[7]  Mr. Schroeder was principal of East from 1999 to 2005.

and visitors encounter these symbols as they drive to the parking lot and walk into the building. Many of these symbols—including a cross on the Church roof and a sign with a cross and the words "ELMBROOK CHURCH"—are visible from the public intersection outside the Church. The street names given to the drives approaching the Church are "Agape" and "Barnabas."[8]

To reach the sanctuary, visitors must pass through the Church lobby, which also has served as a natural congregation point for graduates and their guests after past graduation ceremonies. The lobby contains tables and stations filled with evangelical literature, much of which addresses children and teens, and religious banners, symbols and posters decorate the walls.[9] In

---

[8] "Agape" is defined by the Oxford English Dictionary as "Christian love (of God or Christ or fellow Christians . . . )." Oxford English Dictionary, available at http:// www. oed. com/. Barnabas was an early Christian mentioned in the Bible. *See* Acts 4:36 (Revised Standard Version).

[9] Some examples from images captured at past ceremonies: Banners hanging on the lobby walls bear the messages "Knowing the Lord of Jubilee," "Children's Ministry: Leading Children to a Transforming Life in Christ," "JESUS" and "LORD OF LORDS." An antique-style wooden pushcart labeled "PRAYER" sits in the hallway. A polygonal column displays religious pamphlets and a large sign asking, "Puzzled . . . About Where the Church should be Planted?" on one side. On another column face is a poster labeled "Summer Godsquad." The poster proclaims, "Hey Jr. Highers! Who Are Your Heroes?" and

(continued...)

the middle of the lobby is a large, circular desk displaying pamphlets such as "{young adults}," "{couples ministry}," "{middle school ministry}," "{high school ministry}" and "{college ministry}." The District admits that Church members manned information booths that contained religious literature during the 2009 graduation, and a DVD recording of the 2002 ceremony shows people staffing these tables. The District also admits that during the 2002 ceremony, "Church members passed out religious literature in the lobby" although neither the District nor the Does divulge further details about how the distribution took place or at whose behest. According to Doe 1, when he attended his older sibling's graduation, "[m]embers of the church, instead of school officials, handed out graduation materials during the ceremony."

The graduation ceremonies take place on the dais at the front of the sanctuary, where school officials and students with roles in the ceremony are seated. A large Latin cross, fixed to the wall, hangs over the dais

---

[9] (...continued)

displays cut-out images of movie characters such as E.T., Buzz Lightyear and Marty McFly, a soccer player, unidentifiable public figures and Jesus. On one wall, a carved wooden plaque invites those who view it to " '. . . go and make disciples of all nations . . .' Matthew 28:19." On the walls are literature displays labeled, among other things, "{children}" and "{student}." In one corner of the lobby, a table containing a computer and several displays of religious literature sits under a sign labeled "{children & student connect}."

and dominates the proceedings.[10] The first time Central held its graduation in the sanctuary, the cross was covered, apparently by accident.[11] During subsequent graduations, the Church refused Superintendent Gibson's requests to veil the cross, in keeping with a general Church policy against covering its permanent religious displays. The Church did agree, however, to remove any non-permanent religious symbols from the dais. The chapel used by Central for its senior honors night also contains a cross.

During the ceremonies, "graduating seniors . . . sit down in the front, center rows of pews of the [sanctuary's] main level." Guests sit in the other pews. The parties agree that "Bibles and hymnal books remain in all the pews," as do a "yellow 'Scribble Card for God's Little Lambs,' a pencil, a donation envelope entitled, 'Home Harvest Horizon: offering to the work of Christ,'" and other religious literature. There is no evidence that any of these materials were placed in the pews specifically for the graduation ceremonies.

### 3. The Controversy

Complaints about the District's use of the Church arose soon after the practice began. In 2001, a parent asked

---

[10] "The cross is approximately 15 to 20 feet tall and approximately seven to ten feet wide."

[11] According to an email sent by Superintendent Gibson, the cross "was inadvertently veiled by a custodian."

the District to stop holding graduation ceremonies at
the Church because the parent, a non-Christian, did not
want her child exposed to the Church's alleged
teachings about those who do not share its faith.[12] In that
same year, the Freedom from Religion Foundation and
the American Civil Liberties Union ("ACLU") of
Wisconsin voiced objections to the graduation site
and asserted that it violated the Constitution. The
Anti–Defamation League also objected in 2002, followed
by Americans United for Separation of Church and
State ("Americans United") in 2007.

A series of exchanges in 2007 between Superinten-
dent Gibson and Aram Schvey, litigation counsel for
Americans United, explored the constitutionality of
the practice. Although he defended the venue, Super-
intendent Gibson assured Schvey that "there are no
references to religion or to the church in the gradua-
tion program," that no religious literature would be
distributed and that Superintendent Gibson previously
has "request[ed] removal of any non-permanent
religious banners that may be on stage" and would con-
tinue to do so. Schvey appreciated these steps, but he
requested that the District cover the cross and "all other
religious iconography[,] including permanent banners," or
select a secular venue. Superintendent Gibson responded

---

[12] Specifically, the parent characterized as " 'intensely hateful
and violent' " the Church's active promotion of " 'the idea that
people like [the parent] . . . are going to . . . a Hell-like place
undergoing endless torments.' " (alterations in original).

that the Church "made a policy decision several years ago that [the cross] not be veiled for rentals."

In many of the letters and correspondence, Superintendent Gibson noted that the District was building a new field house that could accommodate graduation ceremonies and had been engaging in efforts to obtain funding to renovate Central's and East's gymnasiums. Although earlier efforts to obtain funding had failed, the public later voted in favor of funding that allowed the District to begin construction and renovation. In 2010, Central and East moved their graduation ceremonies to the District's newly completed field house. Additionally, in July 2009, Principal LaBonte declared his intention to move Central's 2010 honors night to its newly renovated gymnasium; in supplemental briefing before us, the District represented that the promised move had occurred. The District nonetheless refused to state that it would never again hold a graduation in Elmbrook Church.

### 4. The Does

The plaintiffs are current and former students of District schools and their parents. Doe 1 graduated from either Central or East in 2009. Doe 2 is Doe 1's parent and has an older child whose graduation ceremony was held in the Church four years earlier, as well as younger children who attend Elmbrook schools. One of Doe 2's younger children is Doe 3, who "will graduate from a District high school no later than 2014." Does 1 through 3 all attended the graduation ceremonies

of Doe 1 and of Doe 2's older child. Does 4 and 9 are the parents of children currently attending schools in the district; their eldest children are expected to graduate from high school in 2016 and 2015, respectively. "Does 5 and 6 are the parents of Does 7 and 8, who graduated from a District high school in ceremonies held at Elmbrook Church in 2002 and 2005, respectively." Does 2, 4, 5 and 6 also pay property taxes that go to the District.

What the Does all have in common is that they are not Christians.[13] Those of the Does who attended past graduation ceremonies "felt uncomfortable, upset, offended, unwelcome, and/or angry" because of the religious setting. In fact, the setting completely ruined for Doe 5 the experience of his children's graduation ceremonies, some of which he did not attend. Those plaintiffs still in school or with children still in school do not relish the prospect of attending future ceremonies at the Church.

According to the Does, there are many other available venues that the District could use for its graduation ceremonies. Moreover, the Wilson Center could host Central's senior honors night and indeed does host East's. The District already pays the Wilson

---

[13] Doe 1 "subscribe[s] to a religious faith different from Christianity," as do Does 2 and 3. Doe 4 is a humanist, "Does 5, 6, 7, and 8 are atheists," and "Doe 9 is non-theistic, chooses not to be involved in religion, and does not subscribe to the religious teachings of Elmbrook Church."

Center a flat fee each year that allows District schools ample access. The District responds that, although other venues are available for graduation, none is as attractive as the Church, particularly for the price: approximately $2,000 per school per ceremony. However, the Does believe that some of the other venues are roughly equivalent in quality and price.

### B.  Proceedings Before the District Court

On April 22, 2009, the Does filed this action against the District and moved simultaneously for a preliminary injunction that would bar the District from holding its 2009 graduation ceremonies at the Church. After the district court denied that motion, the Does filed an amended complaint asking the district court to enjoin permanently the District from holding school events at the Church or, in the alternative, to enjoin permanently the District from using the Church "unless all visible religious symbols [were] covered or removed." They also sought damages and a declaratory judgment. No discovery was taken, and the parties filed cross-motions for summary judgment. The district court denied the Does' motion for summary judgment, granted the District's and dismissed the case.

After determining that the plaintiffs had standing, the district court proceeded to its Establishment Clause analysis. First, the district court held that the District was not engaging in religious coercion of the sort that the Supreme Court held to violate the Establishment Clause in *Lee v. Weisman*, 505 U.S. 577 (1992), and *Santa*

*Fe Independent School District v. Doe*, 530 U.S. 290 (2000). The district court distinguished those cases on the ground that they "speak to coerced religious participation as opposed to exposure to religious symbols." The district court reasoned that, because there was no religious exercise at the Elmbrook graduation ceremonies, there was no coerced religious participation. Relying on *Lee*, it held explicitly that the plaintiffs' "unease and offense at having to attend graduation ceremonies at the Church and face religious symbols, while in no way minor, is not enough."

Second, the district court concluded that the District's use of the Church does not have the primary effect of endorsing religion in violation of the test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). "On its face," the district court conceded, "the District's decision to hold graduation ceremonies and the senior honors event holds symbolic force." But because "the history and context of the community and the forum reflect that secular concerns directed the move away from school facilities toward an adequate, convenient, cost-effective graduation venue," a reasonable observer would not understand the events to be an endorsement of the Church or its teachings. (internal quotation marks omitted).

Finally, the district court disagreed with the Does that the use of the Church excessively entangled the District with religion. The court found the rental of the Church to be a standard fee-for-use arrangement and a non-enduring relationship. It also determined

that the limited interaction between the District and the Church over the physical setting did not delegate impermissibly to the Church authority over the graduation events. Accordingly, the district court granted summary judgment in favor of the District and dismissed the case.

## II. Discussion

We review a district court's decision to grant summary judgment de novo, making all reasonable inferences in favor of the nonmoving party. *Groesch v. City of Springfield*, 635 F.3d 1020, 1022 (7th Cir. 2011). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### A. Legal Framework

The Establishment Clause of the First Amendment to the Constitution of the United States, made applicable to the actions of state and municipal governments by the Fourteenth Amendment, *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 8 (1947), provides that "Congress shall make no law respecting an establishment of religion." U.S. CONST. amend. I, cl. 1. The three-pronged test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "remains the prevailing analytical tool for the analysis of Establishment Clause claims." *Books v. City of Elkhart* (*Books I*), 235 F.3d 292, 301 (7th Cir. 2000); *see*

*also Sherman ex rel. Sherman v. Koch*, 623 F.3d 501, 507 (7th Cir. 2010) (applying the *Lemon* test), *petition for cert. denied*, 132 S. Ct. 92 (U.S. Oct. 3, 2011); *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 527 (7th Cir. 2009) (same). Under the *Lemon* test, a governmental practice violates the Establishment Clause if it (1) lacks a legitimate secular purpose; (2) has the primary effect of advancing or inhibiting religion; or (3) fosters an excessive entanglement with religion. *See Lemon*, 403 U.S. at 612-13.

The Supreme Court has also advanced two other approaches by which an Establishment Clause violation can be detected. In *Lynch v. Donnelly*, Justice O'Connor's concurrence asserted that under *Lemon*'s "primary effect" prong, "[w]hat is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion." 465 U.S. at 692 (O'Connor, J., concurring). In accord with further Supreme Court precedent approving of the endorsement approach, *see, e.g., Cnty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 592-93 (1989) (opinion of Blackmun, J.) ("[W]e have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion, a concern that has long had a place in our Establishment Clause jurisprudence."), we have viewed the endorsement test as a legitimate part of *Lemon*'s second prong, and observed that under this test, we must "assess[] the totality of the circumstances surrounding the display to determine whether a reasonable person would believe that the display

amounts to an endorsement of religion." *Books I*, 235 F.3d at 304. The second additional Establishment Clause approach—the coercion test found in *Lee* and *Santa Fe*—seeks to determine whether the state has applied coercive pressure on an individual to support or participate in religion. *See Santa Fe*, 530 U.S. at 312; *Lee*, 505 U.S. at 587. Where the coercion test belongs in relation to the *Lemon* test is less clear. *Compare Doe ex rel. Doe v. Beaumont Independent School Dist.*, 173 F.3d 274, 285-86 (5th Cir. 1999) (viewing the *Lemon* test, the endorsement test, and the coercion test as separate methods by which an Establishment Clause violation can be found); *with Lee*, 505 U.S. at 604 (Blackmun, J., concurring) (noting that while "government coercion is not necessary to prove an Establishment Clause violation," religious coercion "is an obvious indication that the government is endorsing or promoting religion."). Apart from how one views the coercion test in relation to the *Lemon* test, however, it is evident that if the state "coerce[s] anyone to support or participate in religion or its exercise," an Establishment Clause violation has occurred. *Lee*, 505 U.S. at 587.

Of course, the touchstone for Establishment Clause challenges remains "the principle that the First Amendment mandates government neutrality between religion and religion, and between religion and nonreligion." *McCreary Cnty.*, 545 U.S. at 860 (quotation marks omitted). The determination is case-specific: whether a particular practice violates the Establishment Clause is "in large part a legal question to be answered on the basis of judicial interpretation of social facts" which "must

be judged in their unique circumstances." *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 315 (2000).

## B.  Application

We conclude that conducting a public school graduation ceremony in a church—one that among other things featured staffed information booths laden with religious literature and banners with appeals for children to join "school ministries"—runs afoul of the First Amendment's Establishment Clause as applied to the states via the Fourteenth Amendment's Due Process Clause.[14] That conclusion is consistent with well-established doctrine prohibiting school administrators from bringing church to the schoolhouse. *E.g., People of State of Illinois ex rel. McCollum v. Bd. of Educ. of Sch. Dist. No. 71, Champaign Cnty.*, 333 U.S. 203, 211-12 (1948) (religious instruction in public schools held unconstitutional). The same result should obtain when administrators bring seminal schoolhouse events to a church—at least to one with the proselytizing elements present in this case. The constitutional flaw with such activity is that

---

[14] While our discussion is focused on the school district's practice of holding graduation ceremonies at Elmbrook Church, the same constitutional defects inhere in the district's use of the church for its honors night ceremonies. *See Santa Fe*, 530 U.S. at 311 (reasoning that conducting invocations at high school football games did not escape the teachings of *Lee v. Weisman* because extracurricular activities are "part of a complete educational experience").

it necessarily conveys a message of endorsement. More-over, the Supreme Court's "coercion cases," *Lee* and *Santa Fe*, cannot be meaningfully distinguished—both because endorsement, especially as it relates to children, has the potential to be coercive, and because there was actual coerced activity in this case.[15]

### 1. Religious Endorsement

Establishment Clause jurisprudence has long guarded against government conduct that has the effect of pro-moting religious teachings in school settings, and the case law has evinced special concern with the receptivity of schoolchildren to endorsed religious messages. In *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), for in-stance, the Supreme Court barred enforcement of a Ken-tucky statute requiring the posting of a copy of the Ten Commandments on the wall of each public school class-room within the state. The Court's brief discussion con-

---

[15] The Does do not argue that the District had a non-secular purpose in choosing the Elmbrook Church for its graduation ceremonies; thus, we need not consider the graduation ceremo-nies under *Lemon*'s secular purpose prong. The Does do argue that the District acted unconstitutionally by conferring control over the physical setting of a public school event, directing tax funds to support the propagation of religion, and creating religious divisiveness. Since we conclude that the District acted unconstitutionally on other grounds, we need not address these arguments, nor must we consider the District's actions under *Lemon*'s entanglement prong.

cluded that the statute was in violation of *Lemon*'s first prong, whether the legislation had a secular purpose. *Id.* at 41 (concluding that the purpose for posting the commandments was "plainly religious in nature"). In reaching that conclusion, the Court entered into a discussion of *Lemon*'s second prong, whether the primary effect of government conduct advances or inhibits religion. The Court reasoned that "[i]f the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the school children to read, meditate upon, perhaps to venerate and obey, the commandments." *Id.* at 42. We perceive essentially the same problem in the circumstances of this case.

Displaying religious iconography and distributing religious literature in a classroom setting raises constitutional objections because the practice may do more than provide public school students with *knowledge* of Christian tenets, an obviously permissible aim of a broader curriculum. *E.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 608 (1987) (Powell, J., concurring). The concern is that religious displays in the classroom tend to promote religious beliefs, and students might feel pressure to adopt them. Such concern was front and center in *Stone* and apparent to one degree or another in the Supreme Court's school prayer cases. *See Wallace v. Jaffree*, 472 U.S. 38 (1985) (Alabama law authorizing a moment of silence for meditation or voluntary prayer held unconstitutional); *Sch. Dist. of Abington Twp., Pennsylvania v. Schempp*, 374 U.S. 203 (1963) (opening exercises featuring Bible recitation and reading of Lord's prayer held unconstitutional);

*Engel v. Vitale*, 370 U.S. 421 (1962) (prescribed daily prayer held unconstitutional). The same problem attends pervasive displays of iconography and proselytizing material at a public secondary school graduation.

In this case, high school students and their younger siblings were exposed to graduation ceremonies that put a spiritual capstone on an otherwise-secular education. Literally and figuratively towering over the graduation proceedings in the church's sanctuary space was a 15- to 20-foot tall Latin cross, the preeminent symbol of Christianity. That symbol "carries deeply significant meaning for those who adhere to the Christian faith." *Salazar v. Buono* 130 S. Ct. 1803, 1836 n.8 (2010) (Stevens, J., dissenting). Moreover, it is a symbol that invites veneration by adherents. *E.g.,* 2 St. Thomas Aquinas, SUMMA THEOLOGICA, q. 25, art. 3 at 2157 (Benzinger Bros., 1947). The cross, like many symbols, is "pregnant with expressive content." *See Texas v. Johnson*, 491 U.S. 397, 405 (1989). It acts as a "short cut from mind to mind," *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 632 (1943), for adherents who draw strength from it and for those who do not ascribe to Christian beliefs. Although the setting in which a symbol is displayed can shape its message, *cf. Buono*, 130 S. Ct. at 1811 (plurality opinion) (stating that the purpose and intent of a Latin cross placed on an outcropping in the desert was "to honor American soldiers who fell in World War I"), there is no doubt that a sectarian message is conveyed by a cross prominently displayed in a house of worship. *See also McCreary Cnty.*, 545 U.S. at 868 (stressing the importance of the context in which a "con-

tested object appears") (quoting *Cnty. of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 595 (1989) (opinion of Blackmun, J.)); *Van Orden v. Perry*, 545 U.S. 677, 701 (2005) (Breyer, J., concurring) (discussing contexts in which Ten Commandments displays might appear).

What is more, Elmbrook Church's sizeable cross was not the only vehicle for conveying religious messages to graduation attendees. Upon passing through the exterior doors of the church, attendees proceeded into a lobby that contained numerous religious materials. Those materials included pamphlets for "middle school" and "high school" ministries. The middle school ministry pamphlet stated, "We are calling students to live and love like Jesus." As previously noted, a poster on the wall asked, "Hey Jr. Highers! Who Are Your Heroes?" and depicts pop culture icons alongside Jesus Christ. Anticipating the desired answer to the poster's question, there were several stations indicating that children and students could obtain religious literature tailored to them. Among the banners that had been draped from the lobby's ceiling during graduation ceremonies was one that read "Children's Ministry: Leading Children to a Transforming Life in Christ." Moreover, all 360 degrees of the lobby's substantial, circular information booth were stocked with religious pamphlets. It was staffed during at least some of the school district's graduation ceremonies, and the literature was readily accessible even without the staff presence. Returning to the sanctuary itself, which is where the ceremonies took place, the pews were supplied with Bibles, hymnals,

and additional informational literature. Children in attendance could find "scribble cards" in the pews on which "God's Little Lambs" could draw. Anyone could partake of the cards soliciting membership in the Church. During at least one graduation ceremony, church members passed out religious literature directly to audience members. Put simply, the environment was pervasively Christian, obviously aimed at nurturing Christian beliefs and gaining new adherents among those who set foot inside the church.

Regardless of the purpose of school administrators[16] in choosing the location, the sheer religiosity of the space created a likelihood that high school students and their younger siblings would perceive a link between church

---

[16] Each dissent suggests that the secular motivations underlying the District's choice help save the practice from constitutional rejection, but we believe that this reasoning impermissibly allows *Lemon*'s purpose inquiry to seep into the analysis of the likely effect of the District's actions. *Lemon*'s purpose inquiry has rarely proved dispositive, *McCreary Cnty.*, 545 U.S. at 859, and the favorable features of the church, such as its space and comfort, do not drive the ultimate inquiry into the constitutionality of its use as a high school graduation venue. *See Lemon*, 403 U.S. at 625 (noting that though taxpayers have been spared considerable expense through the teaching efforts of churches, the "benefits of these schools . . . are not the issue . . . . The sole question is whether state aid to these schools can be squared with the dictates of the Religion Clauses").

and state.[17] That is, the activity conveyed a message of endorsement. High school graduations enjoy an iconic place in American life. *Lee*, 505 U.S. at 583. Given their centrality, the presence of religious iconography and literature is likely to prove particularly powerful, indicating to everyone that the religious message is favored and to nonadherents that they are outsiders. *See Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 9 n.1 (1989) (quoting *Wallace*, 472 U.S. at 38 (O'Connor, J., concurring)). Here, the church was not just adorned with its own symbols, it was draped in the high schools' decorations. Banners for the high schools were

---

[17] Contrary to Judge Posner's and Judge Ripple's suggestions, we do not view the constitutional violation as having been triggered by the fact that the Does took offense to the graduation setting; rather, their reaction was symptomatic of the violation. Nonadherents of a given faith might reasonably take offense to the government's endorsement of that faith, since the endorsement sends the message that the nonadherents are "outsiders, not full members of the political community." *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring). If a particular interaction between the government and religion does not constitute endorsement, however, it would be unreasonable for an individual to be offended by the legality of that action. *See Books I*, 235 F.3d at 320 (Manion, J., concurring in part and dissenting in part) ("It is important to note that while the two plaintiffs involved in this case took offense to the Ten Commandments monument, that is not dispositive because the question is whether an 'objective' observer would believe that the display constituted an endorsement of religion.").

displayed in the lobby and in the sanctuary, mixed in with the church's religious decor and literature. In the sanctuary, the high schools' names were projected onto a large screen adjacent to the Latin cross. Combined with presence of the Church's pamphlets for its "school" ministries, the setting implied to nonadherents in attendance that the school district placed its imprimatur on Elmbrook Church's message. *See Santa Fe*, 530 U.S. at 307-08 (remarking on the intermixing of the invocation with the accoutrements and hallmarks of high school life and concluding that "the listening audience must perceive the pregame message as a public expression of the views of the majority of the student body delivered with the approval of the school administration"). True, the District did not itself adorn the Church with proselytizing materials, and a reasonable observer would be aware of this fact. But that same observer could reasonably conclude that the District would only choose such a proselytizing environment aimed at spreading religious faith—despite the presence of children, the importance of the graduation ceremony, and, most importantly, the existence of other suitable graduation sites—if the District approved of the Church's message.

The effect of endorsement created by the school district's practice is not diminished by the explanation that the space was rented and school officials could exercise less control over the church than they could over a schoolhouse. This view provides only superficial appeal. The point appears most cogent with respect to the Church's cross, although the Church possessed means of covering the symbol. The point appears less

cogent with respect to other aspects of the Church which might have been easily modified to render the space more inviting to others.[18] This mode of distinguishing, however, would have us look at the issue of control through an exceedingly narrow prism. The critical facts are that school administrators effectively required attendance, because graduations are not truly optional, *see Lee*, 505 U.S. at 595, and school administrators selected the venue over several other suitable options. *See Abington Twp.*, 374 U.S. at 222 (the neutrality required by the Establishment Clause aims at preventing church and state from acting in concert such that government support is "placed behind the tenets of one or of all orthodoxies"); *cf. also Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 395 (1993) (no Establishment Clause concern for church group to use school space for an event where the district created a public forum and the event would have taken place outside of school hours and without school sponsorship). Nor is the effect diminished by the administrators' mechanism for choosing the graduation site. The record indicates that, following the results of student elections, the principals of the high schools made the ultimate decisions on where to hold graduation. A "student election does nothing to

---

[18] None of this is to suggest that school officials should have exercised a higher degree of control over the Church's environment, scrubbing it of religious symbols or working to tailor its message to a secular audience. Such a course would have run afoul of *emon's* excessive entanglement prong. *See Bowen v. Kendrick*, 487 U.S. 589, 615-18 (1988).

protect minority views but rather places the students who hold such views at the mercy of the majority." *Santa Fe*, 530 U.S. at 304; *see also McCreary Cnty.*, 545 U.S. at 884 (O'Connor, J., concurring) ("[W]e do not count heads before enforcing the First Amendment.").


### 2. Religious Coercion

In addition to impermissibly endorsing religion, the District's decision to use Elmbrook Church for graduations was religiously coercive under *Lee* and *Santa Fe*. In *Lee*, the Supreme Court invalidated a school district's practice of including benedictions at high school graduations, and highlighted two dominant facts. 505 U.S. at 585-86. First, state officials were directing the performance of a formal religious exercise at a graduation ceremony. *Id.* Second, graduation ceremonies were effectively obligatory even if attendance was technically voluntary. *Id.* After examining the totality of the circumstances, *Lee*, 505 U.S. at 597 (emphasizing the fact-sensitive nature of the inquiry), the Court concluded that the conformity required by the graduation ceremony "was too high an exaction to withstand the test of the Establishment Clause." *Id.* at 598. The same basic concern was evident in the Court's discussions in *Santa Fe*, where the Supreme Court rejected student-led prayer at football games. 530 U.S. at 301. The Court noted that while football games may not be as "extraordinary" in terms of life impact as graduation ceremonies, "the choice between attending these games and avoiding personally offensive religious rituals is in no practical sense an easy one" for some

students, and thus the principles in *Lee* governed. *Id*. at 311-12.

The Supreme Court's decisions in *Lee* and *Santa Fe* cannot be meaningfully distinguished from the case at bar on the ground that the school district did not coerce overt religious activity. *Lee*, 505 U.S. at 605 n.6 (Blackmun, J., concurring) (observing that as a practical matter "any time the government endorses a religious belief there will almost always be some pressure to conform"). Although *Lee* and *Santa Fe* focus on the problem of coerced religious *activity*, it is a mistake to view the coercion at issue in those cases as divorced from the problem of government endorsement of religion in the classroom generally. In fact, they are two sides of the same coin: "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Wallace*, 472 U.S. at 60 n.51 (alteration omitted) (quoting *Engel*, 370 U.S. at 430). And governmental efforts at shaping religious views may prove effective over time. *Lee*, 505 U.S. at 592; *cf. also A Letter to Richard Burke, Esq., on Protestant Ascendency in Ireland*, in vol. VI WORKS OF THE RIGHT HONORABLE EDMUND BURKE 395 (rev. ed. 1866) ("Man and his conscience cannot always be at war."). The fact that graduation attendees need not do anything but participate in the graduation ceremony and take advantage of religious offerings if they so choose does not rescue the practice.

Further, there is an aspect of coercion here. It is axiomatic that "[n]either a state nor the Federal Government . . . can force nor influence a person to go to or to remain away from church against his will." *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947). The first principle is violated when the government directs students to attend a pervasively Christian, proselytizing environment. *Cf. Cnty. of Allegheny*, 492 U.S. at 664 (Kennedy, J., concurring in part and dissenting in part) (observing in the context of creche displays that "[p]assersby who disagree with [their] message[s] . . . are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech"); *Wallace*, 472 U.S. at 72 (O'Connor, J., concurring) (noting that under an appropriately crafted moment of silence law a student "who objects to prayer . . . is not compelled to listen to the prayers or thoughts of others"). Once the school district creates a captive audience, the coercive potential of endorsement can operate. When a student who holds minority (or no) religious beliefs observes classmates at a graduation event taking advantage of Elmbrook Church's offerings or meditating on its symbols (or posing for pictures in front of them) or speaking with its staff members, "[t]he law of imitation operates," *Wallace*, 472 U.S. at 60 n.51, and may create subtle pressure to honor the day in a similar manner. *See also id.* at 81 (O'Connor, J., concurring) (where children are concerned, government endorsement "is much more likely to result in coerced religious beliefs"). The only way for graduation attendees to avoid the dynamic is to leave the ceremony. That is a

choice, *Lee v. Weisman* teaches, the Establishment Clause does not force students to make. *See also McCreary Cnty.*, 545 U.S. at 881-82 (O'Connor, J., concurring) ("Free people are entitled to free and diverse thoughts, which government ought neither to constrain nor to direct.").

### III. Conclusion

In sum, if constitutional doctrine teaches that a school cannot create a pervasively religious environment in the classroom, *Wallace*, 472 U.S. 38; *Stone*, 449 U.S. 39; *Abington Twp.*, 374 U.S. 203; *Engel,* 370 U.S. 421, or at events it hosts, *Santa Fe*, 530 U.S. 290; *Lee*, 505 U.S. 577, it appears overly formalistic to allow a school to engage in identical practices when it acts through a short-term lessee. *See Lee*, 505 U.S. at 595 ("Law reaches past formalism."). The same risk that children in particular will perceive the state as endorsing a set of religious beliefs is present both when exposure to a pervasively religious environment occurs in the classroom and when government summons students to an offsite location for important ceremonial events.

The determination that the District operated outside permissible constitutional bounds should in no way be viewed as expressing hostility toward Elmbrook Church or its members. The First Amendment, via its Free Exercise Clause, guarantees that government will not impinge on the freedom of individuals to celebrate their faiths, in the day-to-day, or in life's grand moments. Without question, that is a desirable goal. Whether the event is a meal, a graduation, or a funeral, a signpost or

a diversion, sincerely held religious beliefs can remind one to give thanks, spur reflection, or provide emotional rescue in dark days. Religion can lead one to perform works that benefit the community or meditate on what it means to live the good life. Secular belief systems, of course, can serve those ends, too, *e.g.*, ARISTOTLE, NICHOMACHEAN ETHICS (J. E. C. Welldon trans., 1923); Seneca, *On the Shortness of Life*, in I AD LUCILIUM EPISTULAE MORALES 322 (Richard M. Gummere trans., 1918), and the Establishment Clause reinforces the promise of the free exercise clause by prohibiting government from influencing how a person relates to the universe. "A state-created orthodoxy puts at grave risk that freedom of belief and conscience which are the sole assurance that religious faith is real, not imposed." *Lee*, 505 U.S. at 592; *see also McCreary Cnty.*, 545 U.S. at 883 (O'Connor, J., concurring).

We conclude that the practice of holding high school graduation ceremonies in the Elmbrook Church sanctuary conveys an impermissible message of endorsement. Under the circumstances here, the message of endorsement carried an impermissible aspect of coercion, and the practice has had the unfortunate side effect of fostering the very divisiveness that the Establishment Clause was designed to prevent.

Accordingly, we REVERSE the district court's grant of summary judgment for the District, REVERSE the district court's denial of summary judgment in favor of the Does, and REMAND to the district court for proceedings consistent therewith.

HAMILTON, *Circuit Judge*. I join fully Judge Flaum's opinion for the en banc court. His opinion provides a straightforward application of Establishment Clause doctrine to a relatively new context, when a public school chooses to hold one of its defining ceremonies in the sacred worship space of a particular faith. Judge Flaum's opinion explains thoroughly and persuasively why this case cannot be meaningfully distinguished from *Lee v. Weisman*, 505 U.S. 577 (1992), and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000). I write separately only to respond to some concerns raised by the dissenting opinions—not their disagreements with Supreme Court precedents, but three specific criticisms of the court's opinion that deserve respectful attention and response.

First, Judge Ripple's and Judge Posner's dissents suggest that this decision will invite a new jurisprudence of iconography, one that will focus on the details of religious symbols on display and that may even allow public school graduation ceremonies in worship spaces used by some faiths and not others. Judge Ripple suggests that this decision will itself endorse "safe religions," and Judge Posner wonders how this precedent should apply to churches that have few religious symbols or images in their sanctuaries. I do not share these fears. Judge Flaum's description of the details of the large cross over the altar and the other religious symbols and activities in the Elmbrook Church illustrates the sacred character of this particular worship space and the experience of non-believers when they attend public school graduation ceremonies there. The

logic of the court's opinion points toward a conclusion that those specific details are not decisive. The critical point is that this important rite of passage in the life of a public school and its students is held in the sacred worship space of *any* faith, absent unusual and extenuating circumstances such as a temporary emergency. We all recognize that a divisive parsing of differences between faiths would be anathema to First Amendment law and religious liberty. Nevertheless, Judge Flaum is prudent to decide only the facts actually before us and to leave room to consider unexpected facts and new arguments in later cases.

Second, the dissenting opinions accuse the plaintiffs and those who agree with them of hypersensitivity or applying a standard of an "obtuse" observer rather than a reasonable one. In Establishment Clause litigation, this is often the response to plaintiffs of minority religious traditions. The point calls for a deeper response in terms of how courts evaluate claims that a government practice endorses a particular faith. When federal courts deal with entanglements between government function and private religious faith, we confront some of the most sensitive aspects of our Nation's public life. We try to hold the delicate balance between the Establishment Clause and the Free Exercise Clause. We try to ensure that we recognize and protect faith and its importance in our individual, community, and national lives, on the one hand, while avoiding government support, endorsement, and subtle coercion in favor of particular faiths, on the other. To maintain these balances, the endorsement test asks whether a reasonable observer,

apprised of the circumstances and history of the disputed governmental practice, would conclude that it conveys a message of endorsement or disapproval of religious faith. *E.g.*, *Milwaukee Deputy Sheriffs' Ass'n v. Clarke*, 588 F.3d 523, 528 (7th Cir. 2009).

The danger, of course, is that this "reasonable, objective observer," as in most fields of law, tends to sound a lot like the judge authoring the opinion. See *Utah Highway Patrol Ass'n v. American Atheists, Inc.*, 132 S. Ct. 12, 19-21 (2011) (Thomas, J., dissenting from denial of certiorari) (describing disagreements among circuit judges' views of the reasonable observer). Judge Posner raises this concern, noting that judges in Establishment Clause cases inevitably will "fall back on their priors, that is, on beliefs based on personality, upbringing," attitudes toward religion, and even political orientation. *Post* at 71-72.

The solution is not to require those troubled by government endorsement of religion to stop complaining and adopt an austere, Senecan stoicism. Rather, as judges, we must do our level best to overcome our individual perspectives. We can do so by deliberately trying to see the situation from others' points of view. When deciding a question of endorsement, it is critical that the inquiry include the perspective of those who do not share the faith at issue. The key question is whether a given practice "sends the . . . message to . . . nonadherents 'that they are outsiders, not full members of the political community.'" *Santa Fe*, 530 U.S. at 309-10 (opinion for the Court), quoting *Lynch v. Donnelly*, 465 U.S. 668, 688

(1984) (O'Connor, J., concurring); see also *Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 799 (1995) (Stevens, J., dissenting) ("It is especially important to take account of the perspective of a reasonable observer who may not share the particular religious belief [the State] expresses."); *Lee v. Weisman*, 505 U.S. at 606 n.9 (Blackmun, J., concurring) ("Direct government action endorsing religion or a particular religious practice is invalid under this approach because it sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."), quoting *Wallace v. Jaffree*, 472 U.S. 38, 69 (1985) (O'Connor, J., concurring in judgment); Lawrence H. Tribe, *American Constitutional Law* § 14-15, at 1293 (2d ed. 1988) ("in deciding whether a government practice would impermissibly convey a message of endorsement, one should adopt the perspective of a non-adherent").

Adopting the perspectives of reasonable non-adherents should dampen any tendency judges may have to allow their own subjective sensibilities to creep into the legal analysis. By asking whether a governmental practice would make members of a religious minority group reasonably feel that their faith is disfavored, the focus shifts from the perceptions of the in-group to those of the out-groups. These two perspectives will often diverge. "[A]ctions that reasonably offend non-adherents may seem so natural and proper to adherents as to blur into the background noise of society." Tribe, *supra*, at 1293. It is too easy for

a majority to underestimate the needs and values of minorities. See *Goldman v. Weinberger*, 475 U.S. 503, 523-24 (1986) (Brennan, J., dissenting).

This additional focus also strengthens the First Amendment's core value of protecting members of minority faiths and non-believers from persecution and exclusion by religious majorities. See *Engel v. Vitale*, 370 U.S. 421, 431 (1962) ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain."); *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 9-10 (1947) (Religion Clauses were adopted against backdrop of "religious establishments which all, whether believers or non-believers, would be required to support and attend" and "old world practices and persecutions" "designed to strengthen and consolidate the established faith by generating a burning hatred against dissenters"); see also *Pinette*, 515 U.S. at 799 (Stevens, J., dissenting) ("A paramount purpose of the Establishment Clause is to protect such [a nonadherent] from being made to feel like an outsider in matters of faith, and a stranger in the political community."); *Goldman*, 475 U.S. at 524 (Brennan, J., dissenting) ("A critical function of the Religion Clauses of the First Amendment is to protect the rights of members of minority religions against quiet erosion by majoritarian social institutions that dismiss minority beliefs and practices as unimportant, because unfamiliar.").

   This does not mean that any time a non-adherent plain-tiff perceives a government endorsement of another faith, the inquiry is over and the plaintiff wins. Far from it. The reasonable observer test assumes a non-adherent who knows the history and circumstances of the governmental practice in question, and who remains, well, reasonable. This case becomes relatively easy, though, when the relevant constitutional question is: Would a non-Christian student or parent attending the graduation at Elmbrook Church have reasonably felt excluded by the choice of location? Judge Flaum's opinion for the court considers this question and correctly concludes that the answer is yes.

   To make the point another way, it would be much easier to treat these plaintiffs as "hypersensitive" or "obtuse" if there were any evidence that other public schools in the United States were using worship spaces of *minority* religions for graduation ceremonies. Would Christian majorities feel comfortable or excluded if their public school graduation ceremonies were held in synagogues, mosques, or Baha'i temples, for example? There is no indication that has ever happened anywhere in the United States. If it were proposed, I expect there would be significant opposition from many Christian students and their families, probably expressing views familiar to the plaintiffs in this case. In applying the endorsement test, therefore, if we think non-adherents might be hypersensitive, we should imagine the shoe on the other foot. Call it the Golden Rule, the Categorical Imperative, or what you will, this principle of reciprocity is fundamental to morality and the rule of law. In the

endorsement analysis in this case, therefore, we should ask ourselves whether members of the religious majority would be comfortable participating in and attending graduation ceremonies in such venues sacred to other faiths. In the absence of evidence of such events, I believe the answer for many would be no.

This point is not a criticism of those who would prefer not to have their ceremonies in such locations. The point is that the plaintiffs in this case, who are not adherents of the majority Christian faith in this school district, were not unreasonable, obtuse, or hypersensitive in perceiving a government endorsement of Christianity when rites of passage with the symbolic importance of public high school graduations were held in a Christian sanctuary beneath the powerful symbol of the empty cross.

Third, the dissenting opinions say the court's decision will invite a parade of difficult challenges to routine and benign government activities. I respectfully suggest that these challenges are not difficult. The dissenting opinions attempt, for example, to equate holding a graduation ceremony in sacred worship space to holding a ceremony in a sports arena or a movie theater, to selecting a brand of piano or beverage, or to praising the virtues of eating beef. These comparisons all have the unintended effect of demeaning religious faith and denying the power of its symbols, both for those who believe and for those who do not. The dissents' hypotheticals are easily distinguishable on this basis.

The dissents' strongest point is the analogy to voting. Voting in public elections takes place in many churches

and at least some synagogues and mosques, as well as schools, fire stations, town halls, and other public buildings. Voting is the defining way that citizens participate in governing. Why does the court's reasoning on the public school's graduation ceremony not extend to voting in churches and other places of worship? A closer look at the "history and circumstances" of voting practices provides the answer.

First, voting usually takes place in non-consecrated parts of the church or other place of worship. See, *e.g.*, *Otero v. State Election Bd.*, 975 F.2d 738, 741 (10th Cir. 1992) (use of churches as polling places defended where churches "typically have a commons area, parish hall, foyer, nursery or some other such nonconsecrated portion of the church building which can be used as the polling place"). In addition, there are ready alternatives—such as absentee or early voting—for voters who do not wish to vote in a house of worship where they are not comfortable. See *Berman v. Bd. of Elections*, 420 F.2d 684, 685 (2d Cir. 1969) (holding that availability of absentee voting and voting in adjoining district rendered moot the First Amendment claims of a voter who objected to voting in church).[1]

---

[1] Chief Judge Easterbrook notes the variations in state laws on absentee voting and early voting, *post* at 68 n. †, but most states, including Illinois and Wisconsin, allow early or absentee voting for any reason. See 10 ILCS 5/19-1; Wis. Stat. § 6.20. Indiana law allows both early and absentee voting for a host of reasons, so it would not be difficult for a voter who was unwilling to vote at

(continued...)

In terms of history and circumstances, American election days have historically been all-hands-on-deck efforts, calling on hundreds of thousands of volunteer poll workers and owners of many thousands of all sorts of public and private buildings to provide convenient neighborhood voting. Yes, voting takes place in churches, but also in synagogues, mosques, Masonic temples, skating rinks, funeral homes, bakeries, and so on. Even if a voter perceives an endorsement by use of a church for his particular polling place, the informed reasonable observer would know that many houses of worship from many faiths, along with a wide variety of other public and private spaces, are used to make voting as convenient as possible. From this more complete perspective, there is no endorsement of a particular faith but instead a sometimes frantic effort to find enough places willing to put up with the traffic and disruption that go with running an election. Finally, voting in the modern United States remains an individual act, alone in a voting booth, rather than a public ritual that is a symbolic rite of passage, like a graduation ceremony. All of these circumstances diminish the risk of government endorsement of a particular faith when churches are used as polling places. If these

---

[1] (...continued)

a place of worship to do so. See Ind. Code § 3-11-10-24. If the court confronts a case where conscience prevents a voter from voting at the designated site and there truly is no practical alternative, the court can deal with it then. For the students and families of the Elmbrook School District, by contrast, there was no alternative graduation ceremony.

grounds for distinction may not apply in a particular voting case, there will be time to consider the particulars. The court's reasoning in this case should not affect the way that voting is ordinarily handled in the United States.

* * *

When the Nation's Founders set the boundaries on the power of government, the first words they ratified in the Bill of Rights were "Congress shall make no law respecting an establishment of religion . . . ." The Founders recognized that we are a people of many strong and vigorous faiths. They acted to protect the liberty to practice any of those faiths or none at all. They also knew centuries of history in which religious conflicts had caused war and oppression. They recognized that even the best intentions of people of faith can lead to division, exclusion, and worse. So enforcing the Establishment Clause is not hostile to religious liberty. It protects that liberty for all. It is no accident that religious faith remains so vibrant in this Republic that has guarded against government establishment, including government endorsement, of particular faiths. As the author of the First Amendment wrote: "experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation." James Madison, Memorial and Remonstrance Against Religious Assessments (1785), in 8 *The Papers of James Madison* 295, 301 (W. Rachal, R. Rutland, B. Ripel & F. Teute eds., 1973). Judge Flaum's opinion for the court reaches and ably explains the correct result in this case.

RIPPLE, *Circuit Judge*, with whom EASTERBROOK, *Chief Judge*, and POSNER, *Circuit Judge*, join, dissenting. In the panel opinion,[1] I set forth, in plenary fashion, my views on the appropriate disposition of this case. There, I wrote that, on the basis of existing law and on the facts of record, the district court correctly granted summary judgment because, in reply to the defendants' motion for summary judgment, the plaintiffs simply had not come forth with sufficient evidence to establish a violation of the Establishment Clause. I adhere to that view, and, rather than elongate unduly this opinion, I invite the reader's attention to the views that I expressed there.

Although I could stop at this point, my respect for the views of my colleagues in the majority and my obligations to the Supreme Court, which very well might be asked to review this matter on a petition for a writ of certiorari, and to my fellow judges in other circuits, who might face similar arguments in future cases, require that I set forth the basis of my respectful disagreement with the analysis employed in the majority opinion.

There is no disagreement between myself and the majority about the general principles of Establishment Clause jurisprudence. The majority correctly notes the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), under which a *governmental* practice violates the Establishment Clause if it lacks a legitimate secular purpose, if it has the primary effect of advancing or inhibiting

---

[1] *Doe ex rel. Doe v. Elmbrook Sch. Dist.*, 658 F.3d 710 (7th Cir. 2011).

religion or if it fosters an excessive entanglement with religion. *See Lemon*, 403 U.S. at 612-13. The majority also observes, correctly, that the Supreme Court has held that, under the "primary effect" prong of the *Lemon* test, the government cannot engage in a practice that has the primary "effect of communicating a message of *government* endorsement or disapproval of religion." *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984) (O'Connor, J., concurring) (emphasis added); *see also Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (recognizing that the endorsement analysis proposed by Justice O'Connor is a "relevant question" in Establishment Clause cases). To violate this principle, the *governmental* practice must amount to an endorsement of religion or of non-religion. Finally, the majority notes, again correctly, that the Establishment Clause forbids coercive pressure on an individual to support or to participate in a religious activity. *See Santa Fe*, 530 U.S. at 312; *Lee v. Weisman*, 505 U.S. 577, 587, 592-93 (1992).

Although we agree on the basic legal framework governing Establishment Clause cases, there remains a significant *legal* disagreement between my views and those expressed by my colleagues in the majority opinion. With great respect, I cannot accept, as a threshold matter, the majority's view that its holding today is only a fact-specific application of these general principles and that this case is nothing more than the judicial analogue

of an excursion ticket "good for this day and train only."[2] In my view, today's holding significantly alters existing principles in Establishment Clause analysis with respect to coercion. In doing so, it sets this circuit's Establishment Clause jurisprudence in a direction that may result in another form of coercion—the coercion of religious entities to conform to a judicially crafted notion of an acceptable "civil religion."[3] Those religious entities that resist this pressure will be marginalized in American civil life. This result is neither required nor sanctioned by Supreme Court precedent. In short, by extending established law beyond the limits of its underlying rationale, the majority has transformed, significantly, the work of the Supreme Court and recalibrated, significantly, the relationship of religion and government. The court therefore "has decided an important federal question in a way that conflicts with relevant decisions" of the Supreme Court of the United States.[4]

The court's decision today rests on its extension of the Supreme Court's decisions in *Lee* and *Santa Fe* beyond the boundaries of their rationales. In those cases, the Supreme Court held that including a prayer in the official program of a high school graduation ceremony or football game amounted to state sponsorship of religious activity and coerced the attending students to

---

[2] *Smith v. Allwright*, 321 U.S. 649, 669 (1944) (Roberts, J., dissenting).

[3] *See infra* note 17 and accompanying text.

[4] Supreme Court Rule 10(c).

participate, at least passively, in that religious prayer activity. There, the state had affirmatively sponsored, endorsed and coerced participation in a specific religious activity. In *Lee*, students were expected to stand while a member of the clergy publically recited a prayer as part of the graduation program. The Court noted that "[t]he undeniable fact is that the school district's supervision and control of a high school graduation ceremony places public pressure, as well as peer pressure, on attending students to stand as a group or, at least, maintain respectful silence during the invocation and benediction." *Lee*, 505 U.S. at 593. What had occurred, concluded the Court, was that the public school district, by conducting its graduation ceremony in such a way, effectively had "required participation in a religious exercise." *Id.* at 594. Similarly, in *Santa Fe*, the Court determined that including a student-led prayer in the program of a football game placed the same sort of pressure on the unwilling student attendee. The government, the Court concluded, had improperly coerced the student attendees to participate in an act of religious worship. *Santa Fe*, 530 U.S. at 312. This practice violated the basic maxim that "the religious liberty protected by the Constitution is abridged when the State affirmatively sponsors the particular religious practice of prayer." *Id.* at 313.

The majority takes the view that the situation before us today is controlled by the holdings of *Lee* and *Santa Fe*. The difficulty is that the record simply does not show the same *governmental* endorsement, sponsorship or coercion of any religious activity. Indeed, an examination

of the record makes it clear that no such governmental sponsorship, endorsement or coercion in fact took place.

Faced with this total absence of any showing of governmental sponsorship, endorsement or coercion of any religious activity—the essential focus of the Supreme Court's holdings in *Lee* and in *Santa Fe*—the majority opinion makes the fulcrum of its argument another analogy and declares that the leasing of space in a church for a high school graduation is the constitutional equivalent of "bringing church to the schoolhouse." Majority Op. at 21. It suggests that the mere presence of religious iconography and similar furnishings in the rented church makes the use of the church's facility an impermissible endorsement of religion that has the coercive effect of promoting religion. An examination of the situation before us reveals the inappropriateness of this analogy and the novelty of the legal principle and the resulting judicial methodology that it produces.

Here, the District did not yet have a field house that could accommodate large assemblies and was in need of an interior venue for its graduation and honors ceremonies until it could construct a suitable facility of its own. The space at the church was among the rental spaces available in the area. Indeed, it appears from the record that the church regularly makes its facility available to groups for other assemblies. There is no indication in the record—and counsel makes no argument—that the rental was anything other than an arm's-length business transaction between the District and the church. There is no indication that the church made any

special concession from its usual rental policies in order to attract the District's business or to facilitate its use of the property.

Because the court believes that the degree of religiosity of the church's physical appearance is of prime importance to its new theory of coercion, it presents a detailed description of the church's interior and its surrounding landscape, a description that would differ very little if one were to visit countless places of worship across our Nation on any given day. There is no suggestion in the record that the church altered its appearance in any way to proselytize its visitors. Indeed, there is no indication in the record that the church viewed this rental arrangement as an opportunity to proselytize.

The graduation ceremony was completely devoid of references to religion, to the church that rented the space or to any other church. There was no prayer, no religious speaker. No member of the clergy, from the landlord church or from any other congregation, participated in the ceremony or was present on the dais.

The mere recitation of these facts demonstrates that the rhetorical analogy of "bringing church to the schoolhouse" limps badly; a closer examination makes it clear that the analogy falters completely. Common, practical experience establishes that the graduation ceremony is hardly the same as the instructional setting of a public high school. No doubt, as the Justices noted in *Lee*, a public high school graduation is a community celebration of great significance to the students, their parents and relatives, the faculty and the entire community whose

tax dollars have supported the educational endeavor.[5] Student attendance, even if not technically mandatory, is to be expected. Nevertheless, although the graduating students, and presumably their guests, may have been a "captive audience,"[6] it certainly cannot be maintained that, like in *Lee* and in *Santa Fe*, they were coerced into participating, actively or passively, in any religious ceremony or activity. The validity of the majority's proposition therefore depends on whether the students can be said to have been coerced or indoctrinated in any other way by their attendance at the graduation ceremony.

As the majority points out, the Supreme Court has held that the posting of theologically based material, such as the Ten Commandments,[7] in a public school classroom, or the saying of a prayer[8] or the affording of a period of

---

[5] *See Lee v. Weisman*, 505 U.S. 577, 595-96 (1992).

[6] *Id.* at 630 (Souter, J., concurring).

[7] *Cf. Stone v. Graham*, 449 U.S. 39, 42 (1980) ("Posting of religious texts on the wall serves no such educational function. If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.").

[8] *Engel v. Vitale*, 370 U.S. 421, 430-31 (1962).

silence for prayer or meditation[9] in the classroom setting, carries a message of endorsement of the underlying religious principles to the students and, in the classroom environment, can have a coercive effect on those students who do not adhere to those underlying beliefs. "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel v. Vitale*, 370 U.S. 421, 431 (1962).[10] From these cases, the majority asks that we accept that the students will perceive the same endorsement and the same coercion from the incidental presence of iconography, ornamentation and literature in the building rented by their school district for several hours for an admittedly secular graduation ceremony. Our Establishment Clause jurisprudence fortunately has progressed beyond such stereotypical prognostications. We require far more than proximity before we vitiate civil-religious relationships on the ground of endorsement, symbolic union or coercion.[11]

---

[9]  *Wallace v. Jaffre*, 472 U.S. 38 (1985).

[10] *See also id.* at 60 n.51 (quoting *Engel*, 370 U.S. at 431, and collecting similar expressions of this principle).

[11] *See Lynch v. Donnelly*, 465 U.S. 668, 678 (1984) ("In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the

(continued...)

To the reasonable attendee, including the honored high school graduates and "reasonable non-adherents,"[12] it was obvious that the public high school that educated the graduates does not own the church and did not place in the church the various displays and iconography that disturb the plaintiffs. Indeed, the graduates knew well that the iconography belonged to the landlord church, not to their school. They knew that the iconography represents the beliefs of those who use the space, on another day, as a place of worship, not a place of graduation. Indeed, it would be totally unreasonable for any student to attribute to the District any endorsement of the message of the iconography; it belongs to—and they know it belongs to—someone else. It symbolizes the landlord's view, not the District's view. In a building rented for a single occasion of several hours duration, the presence of religious iconography hardly raises a message of endorsement by the very temporary tenant, the District. The graduating students, now by virtue of their graduation, must be considered capable of exercising the judgment expected of all reasonable citizens

---

[11] (...continued)

Court."); *Agostini v. Felton*, 521 U.S. 203, 223-25 (1997) (overruling *Aguilar v. Felton*, 473 U.S. 402 (1985), and *Sch. Dist. of Grand Rapids v. Ball*, 473 U.S. 373 (1985), and noting that the Court had "repudiated [the] assumption on which *Ball* and *Aguilar* turned: that the presence of a public employee on private school property creates an impermissible 'symbolic link' between government and religion").

[12] *See* Opinion of Hamilton, J., at 38.

of a democratic polity. Similarly, the fact that a church
would have all kinds of religious literature and informa-
tion on its programs and on its premises was no great
revelation to the graduation visitors. Such material is
found in most churches in this Nation—as well as in the
newspapers, television programs and websites to which
the average American turns everyday. As one of my
colleagues noted at oral argument, if the District had
chosen to rent a local movie theater for its graduation,
no reasonable person would have thought that the ad-
vertisements for the coming attractions adorning the
lobby bore any endorsement from the high school.

   In short, when the government places a Ten Command-
ments poster on the wall of its school building, it is
there for the instructional benefit of the students, and it is
reasonable for the students to believe that the school
authorities have endorsed it.[13] When the "message"
appears in a church rented for a non-instructional purpose
for several hours, the same conclusion is not reasonable
at all. In the case before us, the record makes clear that
the school district endorsed no religious doctrine,
practice or institution. At most, its rental of the space at
the church recognized the existence of the church, a reality
certainly permissible under the Religion Clauses.[14]

---

[13] *Stone*, 449 U.S. at 42.

[14] *Cf. Lynch*, 465 U.S. at 673 ("No significant segment of our
society and no institution within it can exist in a vacuum or in
total or absolute isolation from all the other parts, much less
from government.").

The plaintiffs nevertheless claim that they "felt uncomfortable, upset, offended, unwelcome, and/or angry," Appellants' Br. 17, because of the religious setting. The Establishment Clause forbids the government's showing, in any way, support for, or a partiality to, any religion, broadly defined. The Establishment Clause forbids the government from endorsing a religion or a religious practice and, in so doing, creating a message that there are "ins" and "outs" on the basis of religious preference within the political community. It protects the individual from the government's coercing him, *because of governmental endorsement*, to join or participate actively or passively in the activity of any religion.[15] But the Establishment Clause does not, and cannot, protect an individual from personal emotional and psychological unpleasantness.[16]

Bereft of any substantive support from *Lee* or *Santa Fe*, the majority opinion nevertheless maintains that mere exposure of the graduation audience to the "pervasively religious," Majority Op. at 33, and, in its view, "proselytizing environment," *id.* at 5, of the church is per se coercive.

---

[15] *Cf. Lee*, 505 U.S. at 594 ("The injury caused by the government's action[] . . . is that the State, in a school setting, in effect required participation in a religious exercise.").

[16] *See id.* at 597 ("We do not hold that every state action implicating religion is invalid if one or a few citizens find it offensive. People may take offense at all manner of religious as well as nonreligious messages, but offense alone does not in every case show a violation.").

It accepts the plaintiffs' argument that, by convening the graduation in a rented church facility that contains the iconography, decorations and literature of the land-lord church, the audience is being coerced unconstitu-tionally to be in the company of these religious signs and symbols. In accepting this argument, the court re-moves the governing case law from its doctrinal moorings and creates a new and, in my view, dangerous principle in Establishment Clause jurisprudence. Al-though the majority's holding is pointedly limited to the situation before it, that holding is animated by the as-sertion that the government must take on the responsi-bility to ensure that its relationships, including its con-tractual relationships, with religious entities do not offend the sensibilities of those who do not care to be exposed to the outward manifestations of a particular religion or of any religion.

Although the development of this new perspective on the breadth of the Establishment Clause must await future cases, it bears noting that the court suggests no principled limitation to this new broad endorse-ment/coercion doctrine. The court offers no reason why this new perspective ought not control *any* relationship or encounter between any other significant govern-mental activity and "pervasively religious" organizations. Majority Op. at 33. Under the approach it announces today, judges apparently are to determine whether a religious institution is too "pervasively religious" to make any participation, including a mere contractual arrange-ment, between the institution and the civil community

unconstitutionally coercive. Judges are to accomplish this task, moreover, through "an unguided examination of marginalia [that] is irreconcilable with the imperative of applying neutral principles in constitutional adjudication." *Cnty. of Allegheny v. Am. Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 676 (1989) (Kennedy, J., concurring in judgment in part and dissenting in part).

It would seem that the probable, and perhaps inevitable, result of this new direction in Establishment Clause analysis is that institutions determined to be "pervasively religious" will be excluded from any participation in the civil polity because their "religiosity" would amount to coercive endorsement on the part of the government. Only a religious entity that strips itself down to a vanilla version of its real self is to be acceptable in the important moments of American civil life. That stripped-down version of our diverse and vibrant religious heritage soon will produce the functional equivalent of a judicially created "civil religion," as the only "authorized" religious participant in any aspect of American civil life.[17] The appearance of any "pervasively" religious organiza-

---

[17] *See Lee*, 505 U.S. at 589-90 (noting that the government may not promote the development of a "civic religion" and stating that "religious beliefs and religious expression are too precious to be either proscribed or prescribed by the State"); *see also* James J. Knicely & John W. Whitehead, *In God We Trust: The Judicial Establishment of American Civil Religion*, 43 John Marshall L. Rev. 869, 894-99 (2010).

tion would amount, under the majority's view, to unacceptable "coercion" of those individuals who might come into even incidental contact with its religious and, in the view of the court, apparently divisive nature. We would no longer be a polity "that lets each [religion] flourish according to the zeal of its adherents and the appeal of its dogma." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952).

As a decision of the en banc court, today's decision will become a cornerstone of our circuit's Religion Clause jurisprudence. Therefore, despite the majority's good faith attempt to limit its decision to the situation before it, we must examine carefully whether the rationale and methodology it advances will affect other areas of American life. The tremors of this decision will no doubt be felt in the area of education. After today's decision, it is difficult to see how any religious sign or symbol associated with a "pervasively religious" institution could be allowed even to cast a shadow on a public educational institution, or on an event sponsored by such an institution. Although we must await further cases to know for certain how the court will treat these situations, the doctrinal and methodological foundation has been laid for a fresh look at many current governmental practices. A public school administration must now consider whether it must forbid teachers from wearing religiously based accessories in the classroom. The court's opinion emphasizes that endorsement/coercion concerns are highest in the classroom. Will the schoolteacher be permitted to wear her necklace adorned with the Star of David? Will her Christian col-

league be permitted to wear a gold cross as a lapel pin? Or to appear in the classroom with ashes in the form of a cross on his forehead at the beginning of Lent? Will the Muslim teacher be allowed to cover her head with a scarf in the classroom? Or will "the sheer religiosity," Majority Op. at 26, of these displays constitute endorsement of religion? Will public high school athletic teams be permitted to enter "pervasively religious" schools for interscholastic academic or athletic activities? Assuming that such interscholastic events are allowed to continue, will the students from Christian schools be asked to refrain from raising their banners that contain a school coat of arms with the cross predominately displayed or will they have to refrain from doing so in order not to "coerce" their public school opponents? Will the basketball or track team of such schools be permitted to wear athletic uniforms with such a pervasively religious symbol in plain sight? What principled distinction does the court suggest to ensure that the approach it establishes in this case will not spread its dominion to these situations? After all, graduations are not the only momentous events in the civil life of a community, and the mere presence of "pervasively religious" symbols in such a setting now must be considered as a coercive endorsement by the state.

Other important areas of American life also will feel the effect of this decision. Can the local elections board preparing for this year's general election really count on using polling places in religious institutions? In the court's view, would it really be constitutionally acceptable for a voter to pass by a statue of the Virgin Mary or a

banner suggesting one should "Come Home to Christ" on the way to a polling booth on ecclesiastical property? Surely, there is no more basic function of a civil community than the act of casting a ballot. As Judge Posner notes,[18] the majority does not consider that the average high school graduate is eighteen years old and that the Twenty-Sixth Amendment prohibits the government from denying citizens who have attained that age the right to vote on account of their perceived youth. Accordingly, the majority fails to recognize that many citizens cast their first ballots before, or shortly after, their high school graduations. Although one's graduation is no doubt a momentous event in his life,[19] voting is the method by which we "share in the sovereignty of the state" and which "ought to stand foremost in the estimation of the law." 3 Papers of Alexander Hamilton 543-45 (Harold C. Syrett ed., 1979). The majority does not explain why a reasonable eighteen-year-old would understand that the government's selection of a church as his polling place does not endorse religion, but its selection of a church as his graduation venue does. Nor does it explain how holding a graduation in a church "'force[s] . . . a person to go to . . . church against his will,'"[20] but conducting an election in a church does not. Although the court applies its new perspective only

---

[18] *See* Opinion of Posner, J., at 79.

[19] *See Lee*, 505 U.S. at 595.

[20] Majority Op. at 32 (quoting *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947)).

to the case before it and no other, it nevertheless creates a legal principle without suggesting a disciplined limitation to that principle.

There has been, in recent times, a great deal of judicial and academic discussion about the continued viability of *Lemon v. Kurtzman*[21] and of the "endorsement test" in particular.[22] Today's decision, adding a new wedge into the traditional relationship of the Nation's religious and civil life and adding a new dimension to the intrusiveness of judicial decision-making into the decisions of local government officials, supports significantly the voices of those who urge the need for a reassessment.

At bottom, today's holding requires that the state assume the affirmative obligation of avoiding any association with a "pervasively religious" organization when that association would require an individual to be exposed—even incidentally and passively—to expressions of that organization's "religiosity." Should this principle, and the judicial methodology that such a principle necessarily would require, become imbedded in our law, it will undermine significantly the principles that presently form the foundations of our Establishment Clause jurisprudence. Those religions that toe the line and conform to the profile of a "safe religion" will enjoy

---

[21] *See, e.g.*, *Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 132 S. Ct. 12, 21 (2011) (Thomas, J., dissenting from the denial of certiorari).

[22] *See id.* at 17-18; *see also* Jesse H. Choper, *The Endorsement Test: Its Status and Desirability*, 18 J.L. & Pol. 499, 510-35 (2002).

full acceptance by the civil polity. Those who remain "pervasively religious" will find themselves in the shadows of the American journey. They will be the permanent "outsiders" in the American conversation.[23] Because today's decision sets the stage for such a jurisprudence, I respectfully dissent.

EASTERBROOK, *Chief Judge*, dissenting.  I agree with Judge Ripple about how the Supreme Court's current doctrine applies to these events. I also agree with Judge Posner that this doctrine is too plastic, making it easy for judges to disagree about its application, as we do today. If the current establishment-clause doctrine had been announced by Congress or an administrative agency, the Supreme Court would declare it unconstitutionally vague. See *FCC v. Fox Television Stations, Inc.*, No. 10-1293 (U.S. June 21, 2012). It is hard to see why the Judicial Branch should exercise more discretion in formulating doctrine than it accords to other branches of government.

Standards such as those found in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and the "no endorsement" rule, not only

---

[23] *Santa Fe*, 530 U.S. at 309-10 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)).

are hopelessly open-ended but also lack support in the text of the first amendment and do not have any historical provenance. They have been made up by the Justices during recent decades. The actual Establishment Clause bans laws respecting the *establishment* of religion—which is to say, taxation for the support of a church, the employment of clergy on the public payroll, and mandatory attendance or worship. See generally Leonard W. Levy, *The Establishment Clause: Religion and the First Amendment* (2d ed. 1994); Philip Hamburger, *Separation of Church and State* 89–107 (2002); Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105 (2003). Holding a high school graduation in a church does not "establish" that church any more than serving Wheaties in the school cafeteria establishes Wheaties as the official cereal. See also Michael W. McConnell, *Coercion: The Lost Element of Establishment*, 27 Wm. & Mary L. Rev. 933 (1986).

The rationale of judicial review is that the Constitution prevails over legislation through conflict-of-laws principles. See *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). When the Constitution does not contain legal rules on a particular topic, then the people, through their elected representatives and their appointees, are entitled to decide. Those who believe the decision of the Elmbrook School District unwise or offensive—and it may well be both—can ask for relief from legislatures, which historically have protected the rights of religious minorities. (The Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb to 2000bb–4, and the Religious Land Use and

Institutionalized Persons Act, 42 U.S.C. §§ 2000cc to 2000cc–5, are recent examples. Allowing conscientious objection to military service is an older one.) The federal judiciary cannot invoke *Marbury* when it is judges, rather than those who wrote and approved the Constitution, who create the rules. And as both *Lemon* and the no-endorsement approach are judicial creations rather than restatements of the first amendment's meaning, they do not justify a claim by judges to have the final word. I have made this point elsewhere, so I do not present an extended argument here. See Frank H. Easterbrook, *Abstraction and Authority*, 59 U. Chi. L. Rev. 349 (1992); Frank H. Easterbrook, *Textualism and the Dead Hand*, 66 Geo. Wash. L. Rev. 1119 (1998). See also *American Jewish Congress v. Chicago*, 827 F.2d 120, 128–40 (7th Cir. 1987) (dissenting opinion).

The District needed a large, air-conditioned auditorium for graduation. It rented one for the day. The record does not show (indeed, plaintiffs do not contend) that the District rented space from Elmbrook Church because of its status as a church—as opposed to indifference to its status as a church, or even *despite* its status as a church. Cf. *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). The record does not show that the District wanted to "send a message." Quite the contrary: as soon as suitable space was available in the District's own facilities, it stopped using the church. The only message a reasonable observer would perceive is that comfortable space is preferable to cramped, overheated space. It may be hard to define the reasonable observer. But all of the Justices agreed in *Capitol Square*

*Review & Advisory Board v. Pinette*, 515 U.S. 753 (1995), that the benchmark is a reasonable rather than an obtuse observer. No reasonable observer believes that renting an auditorium for a day endorses the way the landlord uses that space the other 364 days.

Elmbrook Church is full of religious symbols—but any space is full of symbols. Suppose the School District had rented the United Center, home of the Chicago Bulls and the Chicago Blackhawks. A larger-than-life statue of Michael Jordan stands outside; United Airlines' logo is huge. No one would believe that the School District had established basketball as its official sport or United Airlines as its official air carrier, let alone sanctified Michael Jordan. And if the District had rented the ballroom at a Hilton hotel, this would not have endorsed the Hilton chain or ballroom dancing.

Suppose instead that the School District had rented a movie theater, full of posters for current and future attractions. Would this have endorsed movies or coerced anyone to buy tickets? Of course not. Thus if, as many decisions hold, the government is entitled to be neutral between religion and non-religion, e.g., *Employment Division v. Smith*, 494 U.S. 872 (1990), there is no basis for distinguishing Elmbrook Church from the United Center, the Hilton Milwaukee City Center, or the Palace Theater. Neutrality requires the state to treat religious beliefs and symbols the same as secular beliefs and symbols, not to disfavor religion. The Court has held that public bodies sometimes may choose to avoid dealing with a religious vendor, but it has not held that avoidance is compulsory.

Compare *Locke v. Davey*, 540 U.S. 712 (2004) (a state may decline to extend scholarships for education at a seminary), with *Witters v. Washington Department of Services for the Blind*, 474 U.S. 481 (1986) (Establishment Clause allows such scholarships, if the state is neutral between religious and secular educations).

My colleagues in the majority say that "the message of endorsement carried an impermissible aspect of coercion" (slip op. 34). If there's no endorsement, there's no coercion either. But the majority does not explain how endorsement coerces. If the District were to name Steinway the "official piano of Elmbrook School District," this would not coerce any student or family member to favor Steinway over Baldwin or Yamaha in his musical life, or play the piano rather than the piccolo. In school-prayer decisions such as *Lee v. Weisman*, 505 U.S. 577 (1992), and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000), the Court found that fear of ostracism for public refusal to rise and pray could coerce non-believers to participate. But no prayer or other worship occurred during the School District's graduations; no signs of assent were elicited, so no one was at risk of ostracism for withholding them.

Government often takes sides. Many decisions, of which *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), is a recent example, hold that government is entitled to articulate the position held by elected officials. In *Livestock Marketing* the messages favored the consumption of beef. Producers who did not want to send that message (at least, did not want to pay for it) protested that

they had been coerced, but the Court held that the dissenting producers could not use the first amendment to oblige the government to desist. The government cannot compel any private person to speak (or to keep silent), but the government's expression of its own views does not coerce anyone else to do anything—either to praise or eat beef, or to disdain chicken.

My colleagues' assertion that endorsement is coercive cannot be reconciled with *Livestock Marketing*. The government-speech doctrine articulated in *Livestock Marketing* applies to religious subjects as well as secular ones: *Pleasant Grove v. Summum*, 555 U.S. 460 (2009), holds that a public body may erect its own monuments, expressing its own point of view, without entitling a religious group to equal space. Similarly, Congress may add "under God" to the Pledge of Allegiance as its own point of view without coercing anyone to say the words. See *Sherman v. Wheeling School District*, 980 F.2d 437 (7th Cir. 1992). The President's call for a National Day of Prayer does not coerce anyone to pray. See *Freedom from Religion Foundation, Inc. v. Obama*, 641 F.3d 803 (7th Cir. 2011). Perhaps *Summum* will lead the Court to reconsider the no-endorsement branch of Establishment Clause doctrine; but whether it does or not, *Summum* and other government-speech cases show that endorsement differs from coercion.

If holding graduation in a church endorses that church and coerces support of its religion, does holding elections in a church endorse that church or coerce support of its religion? At least two appellate courts have held that government may use churches as convenient polling

places. See *Otero v. State Election Board*, 975 F.2d 738 (10th Cir. 1992); *Berman v. Board of Elections*, 19 N.Y.2d 774 (1967). The majority disclaims having an opinion on that topic (slip op. 3-4), but we cannot disavow the logical implications of our decisions. The churches in *Otero* and *Berman* surely were as "pervasively religious" (slip op. 33) as Elmbrook Church; *all* churches are "pervasively religious." If graduation in a church is forbidden because renting a religious venue endorses religion, and if endorsement is coercive, then renting a religious venue for voting must be equally unconstitutional.

All of the objections the majority makes to graduation in a church apply to voting in a church. At oral argument, counsel for the plaintiffs contended that voting is not problematic because voters spend less time in polling places than students and families do in graduation ceremonies. This may or may not be true. Sometimes there are long lines. Anyway, for persons who object on principle to entering a house of worship, or a place where a faith different from theirs worships, the length of time inside is irrelevant; these persons will not pass the doors.[†]

---

[†] In some jurisdictions, including Wisconsin, any voter "unable or unwilling" to vote at the designated polling place may cast an absentee ballot. See Wis. Stat. §6.20. Other states limit absentee voting to persons who will be out of the jurisdiction, are not ambulatory, or for other reasons cannot vote in person. Still others take a middle position. Indiana permits mail voting by persons whose faith *prohibits* them from entering a house of

(continued...)

It is easier to justify graduation in a church than voting in a church. No one should feel obliged by conscience or faith to give up his influence in governance—and that's what voting represents. A rule of neutrality between religious and secular sites permits government to use religious venues for graduation and voting alike, though I do not think it wise to use a church for either function. But acting inconsiderately toward persons whose sincere views disfavor conducting public business in religious venues differs from establishing a religion.

---

† (...continued)

worship being used as a polling place. Ind. Code §3-11-10-24(a)(9). Persons whose beliefs make voting in a church obnoxious, but do not prohibit that act on religious grounds, are not similarly accommodated. Cf. *Berman v. Board of Elections*, 420 F.2d 684 (2d Cir. 1969) (holding that accommodating those whose religious views prohibit entry is constitutionally sufficient and adding, *id*. at 686, that "any incidental burden [from holding elections in churches] is so slight that it does not begin to outweigh the interest of the state in having available to it the additional polling places which the use of the churches affords."). Absentee voting therefore is not a general solution—and voters who want to follow the campaign to the end may choose to avoid absentee voting even when they are eligible.

POSNER, *Circuit Judge*, dissenting. I don't agree that by choosing—and not for religious reasons—to conduct its graduation ceremony in a church, a public high school transgresses the command in the First Amendment that "Congress [and by interpretation of the Fourteenth Amendment state governments as well] shall make no law respecting an establishment of religion." (Actually two schools are involved, both located in Brookfield, Wisconsin, but for the sake of simplicity I'll pretend they're one and call it Brookfield High.)

The case law that the Supreme Court has heaped on the defenseless text of the establishment clause is widely acknowledged, even by some Supreme Court Justices, to be formless, unanchored, subjective and provide no guidance. See, e.g., *Utah Highway Patrol Ass'n v. American Atheists, Inc.*, 132 S. Ct. 12 (2011) (dissent from denial of certiorari) ("Establishment Clause jurisprudence [is] in shambles," "nebulous," "erratic," "no principled basis," "Establishment Clause purgatory," "impenetrable," "ad hoc patchwork," "limbo," "incapable of consistent application," "our mess," "little more than intuition and a tape measure"); *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 398-99 (1993) (concurring opinion) (a "geometry of crooked lines and wavering shapes," a "ghoul in a late night horror movie" that can't be slain even though "no fewer than five of the currently sitting Justices have, in their own opinions, personally driven pencils through the creature's heart").

The text and history of the establishment clause provide no clue to whether a public high school (a virtually

nonexistent institution in the eighteenth century) "estab-
lishes" religion when it holds its graduation ceremony
in a church. The opaque phrase "respecting an establish-
ment" casts no light on the question. The phrase may
have been substituted for "establishing" so that the
federal government would be forbidden not only to
create an established church but also to disestablish
New England's quasi-established churches. See, e.g., Kent
Greenawalt, "Common Sense about Original and Sub-
sequent Understandings of the Religion Clauses," 8 *U. Pa.
J. Const'l L.* 479, 484-85 (2006). But Noah Feldman, "The
Intellectual Origins of the Establishment Clause," 77 *NYU
L. Rev.* 346, 405-08 (2002), presents a powerful argument
against the second half of this interpretation.

It's no help to the cause of constitutional interpreta-
tion that religion is an emotional subject and that there is
no systematic evidence of the social, political, psychologi-
cal, cultural, ethical, or indeed religious consequences
of the display of religious symbols in today's United
States. Here as elsewhere evidence-based law remains a
dream. The Supreme Court's effort to marshal some
evidence in *Lee v. Weisman*, 505 U.S. 577, 593-04 (1992), was
a flop, as pointed out in Donald N. Bersoff & David J.
Glass, "The Not-So *Weisman*: The Supreme Court's Contin-
uing Misuse of Social Science Research," 2 *U. Chi. L. Sch.
Roundtable* 279, 288-93 and n. 95 (1995). With no
guidance from the Constitution or the social sciences,
judges inevitably fall back on their priors, that is, on
beliefs based on personality, upbringing, conviction,
experience, emotions, and so forth that people bring to a
question they can't answer by the methods of logic and

science or some other objective method. A judge's political orientation is a particularly important clue to his or her likely vote in a case arising under the religion clauses of the First Amendment; conservative judges are more favorable to religion in their decisions than liberal ones, though only on average rather than in every case. Michael Heise & Gregory C. Sisk, "Religion, Schools, and Judicial Decision Making: An Empirical Perspective," 79 *U. Chi. L. Rev.* 187 (2012); Gregory C. Sisk & Michael Heise, "Ideology 'All the Way Down'? An Empirical Study of Establishment Clause Decisions in the Federal Courts," 110 *Mich. L. Rev.* 1201 (2012).

The best that a judge of determined neutrality faced with a case such as the present one can do is to be guided by Gibbon's aphorism (from chapter 2 of the *Decline and Fall*) that "the various modes of worship, which prevailed in the Roman world, were all considered by the people, as equally true; by the philosopher, as equally false; and by the magistrate, as equally useful." For "the Roman world" substitute "the United States" and for "the magistrate" substitute "the judge" and one has the right starting point for the analysis of this case. The judge should not be concerned with the truth or falsity of any religious faith but should regard the various faiths as "equally useful" from the standpoint of society, in recognition of the importance that Americans attach to religion, the diversity and intensity of their religious beliefs and observances, and the bitterness and strife that the government's taking sides among competing faiths would engender. One can certainly agree with the Supreme Court that "all creeds must be tolerated and

none favored." *Lee v. Weisman*, *supra*, 505 U.S. at 589-90; see also *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532-33 (1993); *Everson v. Board of Education*, 330 U.S. 1, 15-16 (1947). And for this purpose atheism (in ancient Rome the philosophers' creed) is a religious creed.

Elmbrook Church is a huge church (a "megachurch") self-described as "a non-denominational, evangelical Christian church that welcomes people of all backgrounds. We believe that God loves all people and that His word, the Bible, has practical spiritual guidance for every life situation." "About Elmbrook," www.elmbrook.org/about-elmbrook/ (visited July 10, 2012). The students at Brookfield High overwhelmingly and emphatically deemed the school's gym an inadequate venue for the graduation ceremony. Yet it was the only possible one on the school's grounds (apart from the football field, also deemed inadequate—the students wanted to be indoors with air conditioning). Bowing to their wishes the school chose Elmbrook Church, the students' first choice. The plaintiffs do not argue that the choice was motivated by religious considerations even though the school district's superintendent attends it. Nor do they deny that purely secular considerations, such as seating capacity, comfort, location, and price, may well have made the church the best alternative to the school's gym.

The graduation, though held in the church's auditorium (a designation that the church uses interchangeably with "sanctuary"), where religious services

are held on Sunday, is conducted by school officials rather than by church officials and is entirely secular. It is the same ceremony that would have been conducted in the school's gym had graduations been held there.

The auditorium is dominated by a huge cross on the front wall, facing the pews. Religious banners festoon the interior walls and proselytizing pamphlets are within easy reach of persons seated in the pews and walking through the lobby. At at least one graduation the lobby's religious-information booths were staffed. And at that or another graduation church members passed out religious literature to the audience. But there is no evidence that school officials endorsed or encouraged this or any other religious activity during the graduation. This distinguishes the two cases on which the plaintiffs mainly rely, both of which involved school-sanctioned prayer at public school events. In *Santa Fe Independent School District v. Doe*, 530 U.S. 290, 305, 308 (2000), the Supreme Court termed such prayer an "actual endorsement of religion"—"a public expression of the views of the majority of the student body delivered with the approval of the school administration." And in *Lee v. Weisman*, *supra*, 505 U.S. at 588, it termed such prayer "an overt religious exercise in a secondary school environment."

Religious décor would be inappropriate in a public school classroom—it would signal an "actual endorse-ment of religion." But the auditorium of Elmbrook Church is no more a classroom than the National Cathedral in Washington is when public school students are taken on a tour of it. Nor is this a case in which a public school

district, pleading poverty, sells its schools and rents a church building in which to hold classes; again the appearance of endorsement would be inescapable. The difference between a public school's using a church two or three hours a year and its using it a thousand-odd hours a year is one of degree rather than of kind, but differences of degree are inescapable grounds of legal distinctions. "I am the last man in the world to quarrel with a distinction simply because it is one of degree. Most distinctions, in my opinion, are of that sort, and are none the worse for it." *Haddock v. Haddock*, 201 U.S. 562, 631 (1906) (Holmes, J., dissenting). "Here, indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind." *Welch v. Helvering*, 290 U.S. 111, 114 (1933) (Cardozo, J.).

It will not do to equate school activity at a church to church activities at a public school. The religion-in-school cases, such as *Stone v. Graham*, 449 U.S. 39 (1980) (per curiam), cited by the majority, held that the establishment clause had been violated because the government was trying to induce kids to engage in religious activity, and that isn't alleged in our case.

The plaintiffs argue that by picking a church for graduation ceremonies, the school, even if unintentionally, was aiding religion in general and the church's sect (Evangelical Protantism) in particular, and that any governmental aid to religion is unconstitutional. But by this token providing police and fire protection for churches is unconstitutional, along with exempting them (as not-for-profit institutions) from property taxes, an

exemption upheld against a challenge based on the establishment clause in *Walz v. Tax Commission*, 397 U.S. 664 (1970). And by that same token a government agency's buying Gewürztraminer produced at the Klosterneuburg Monastery in Austria, Slivovitz produced at the Troyan Monastery in Bulgaria, or Chimay produced by Trappist monks, is unconstitutional, as placing a stamp of government approval on a religious product.

True, in these instances the government is simply treating religious property owners like their closest secular counterparts. But the same is true of allowing them to rent space to government enterprises, such as public schools. Churches typically are fully utilized on only one day of the week (apart from religious holidays), and private organizations that have unused space often rent the space to public as well as private bodies. Among these organizations are churches, which commonly rent space to government for polling places in elections—a practice the courts have upheld, *Otero v. State Election Board*, 975 F.2d 738, 740-41 (10th Cir. 1992); see also *Berman v. Board of Elections*, 420 F.2d 684 (2d Cir. 1969) (per curiam), even though it puts the prospective voter to a choice between entering a church and giving up his right to vote, unless permitted to vote by absentee ballot. One church, and it is doubtless not alone, "has permitted others to use its facilities for non-religious purposes over the years, including for polling stations, government food distribution programs, town meetings, Alcoholics Anonymous meetings, Harvest Festival activities, water department meetings, and a senior lunch program." *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 962 (9th Cir. 2011).

But could it be that the cross and the banners and other religious paraphernalia visible to occupants of the auditorium of the Elmbrook Church would predispose attendants at the graduation to join the church, thus giving the evangelical sect that owns it a competitive advantage? And might not the conferral of such an advantage be thought a form of establishment? But the plaintiffs find the church offensive, and are thus in no danger of being converted. There is no suggestion that holding a high-school graduation at the Elmbrook Church has *ever* triggered a conversion.

How often are visitors to churches converted by the visit? Conversion generally precedes attendance. How many of the millions of non-Catholic visitors to St. Peter's—Protestants, Jews, Muslims, Hindus, Buddhists, atheists, and so forth—have converted to Catholicism as a result of their visit to that awesome site? I mean no disrespect to the Elmbrook Church in pointing out that no counterpart to the treasures of St. Peter's that include Bernini's *baldacchino* and Michelangelo's *Pietà*, the tombs of 91 Popes, a fragment of the True Cross, and the spear that pierced Christ's side at the Crucifixion (of course the authenticity of the last two items has been questioned), is to be found there.

The plaintiffs argue that by holding its graduation ceremony in a church festooned with religious symbols, Broomfield High is "coercing students and parents to attend a house of worship." "Coercing?" That is hyperbole. Attendance at graduation isn't compulsory, graduation is not a "coerced activity," and a student who attends gradua-

tion in Elmbrook Church no more attends a religious ceremony than the cleaning crew when it sweeps the church's aisles. When the Supreme Court said in *Lee v. Weisman*, *supra*, 505 U.S. at 586, 595, in florid hyperbole that "attendance and participation in the [graduation ceremony] are in a fair and real sense obligatory, though the school district does not require attendance as a condition for receipt of the diploma," as "it is apparent that a student is not free to absent herself from the graduation exercise in any real sense of the term 'voluntary,' for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years," it was whistling in the dark.

The plaintiffs say the church is "using its control over the environment of the graduation ceremonies to expose thousands of attendees per year—including numerous youths—to its religious message." There is nothing to suggest that the church enhances the religiosity of its interior décor for the graduation. The interior is what it is. A church that rents space to a secular organization shouldn't be required to pretend it isn't a church.

The *reductio ad absurdum* is the plaintiffs' complaint, as unrealistic about the modern American high schooler as the Supreme Court in *Lee v. Waisman*, that when the students sit down in the church pews for the graduation ceremony, church literature visible to them in the book racks on the backs of the pews in front of them tells them they're "God's Little Lambs," and thoughtfully provides them with a "Scribble Card for God's Little

Lambs" and a pencil to scribble with, and thus tries to seduce them to Evangelical Protestantism. Imagine how 18-year-olds react to being called little lambs! True, the family members who attend the graduation may include children, but in no sense are they coerced *by the school* to attend the graduation.

The idea that mere exposure to religious imagery, with no accompanying proselytizing, is a form of religious establishment has no factual support, as well as being implausible. Religion is for good or ill a large component of human culture, including American culture. Religious words and symbols are ubiquitous. I have heard oral argument in this court on more than a thousand occasions, and every session has begun with a member of the court's staff intoning "God save the United States and this honorable court." Should this outcry, or the religious paintings in the National Gallery in Washington (another federal facility), seen over time by millions, be considered an establishment of religion? Does it send trial lawyers running to the baptismal font? The court crier's phrase, if thought anything other than a fossil trace of a more unselfconsciously Christian era in the nation's history, can't be interpreted as anything other than a governmental expression of belief in one God who influences the fortunes of our nation and may even if properly appealed to protect the United States Court of Appeals for the Seventh Circuit. It is explicitly religious, but it is also innocuous.

The interior of the Elmbrook Church, perhaps the very idea of a church, offends the plaintiffs. But offense can't be the criterion for an establishment of religion; if it were,

no challenge based on the establishment clause would ever fail, for those challenges are invariably mounted by people offended by the government's association with religion. So performance of a blasphemous play in a public university's theater, upheld in *Linnemeir v. Board of Trustees of Purdue University*, 260 F.3d 757 (7th Cir. 2001), would be held to violate the establishment clause by associating government with antireligious expression that offends devout Christians. Hypersensitivity is not a First Amendment principle.

But *de minimis non curat lex* is. *Brandt v. Board of Education*, 480 F.3d 460, 465 (7th Cir. 2007), citing *Ingraham v. Wright*, 430 U.S. 651, 674 (1977). As the Supreme Court has explained, "The First Amendment does not prohibit practices which by any realistic measure create none of the dangers which it is designed to prevent and which do not so directly or substantially involve the state in religious exercises or in the favoring of religion as to have meaningful and practical impact. It is of course true that great consequences can grow from small beginnings, but the measure of constitutional ad-judication is the ability and willingness to distinguish between real threat and mere shadow." *Lee v. Weisman*, *supra*, 505 U.S. at 598, quoting *School District of Abington Township v. Schempp*, 374 U.S. 203, 308 (1963) (concurring opinion). This is a bit of common sense to set against the Court's ode to high school graduation.

The likely effects of today's decision will be, first, to confirm the view of many religious Americans that the courts are hostile to religion; second, to infuriate

students and their families by depriving them of the best site for their high school graduation (the school district in this case has built a new building that will house future graduation ceremonies, but any other public schools in the Seventh Circuit that hold their graduation ceremonies in churches will have to scramble for alternative sites); and third, to initiate what federal law does not need: a jurisprudence of permissible versus impermissible rentals of church space to public schools and other public entities. The majority opinion leaves open the possibility that if the high school burned down and the church were the only feasible site for holding classes while the school was out of commission, such a public use of religious property would be permissible. An emergency exception to the rule laid down today is appropriate, but the list of exceptions won't end there. What if the school didn't burn down but only the gym, and what if, thinking their principal competitor, Elmbrook Church, had been eliminated from consideration as the substitute venue for the graduation, the owners of alternative venues raised their rental price and the church responded by lowering its price? Could the high school then, in this period of diminished public school budgets, plead economic necessity for continuing to hold its graduation ceremony in the church?

And what if Elmbrook Church were not Evangelical—were instead a New England Congregational church, which often has no cross on the outside and meager religious imagery inside; for there is an iconoclastic streak in Protestantism, though not in Elmbrook Church any more than in the great Anglican cathedrals. Would

that change the outcome of this case? The majority, having stated at the outset that the case must be decided by reference to "the set of facts before us" (though its conception of facts is not mine: I don't think such statements as "endorsement is intrinsically coercive" are factual, or even meaningful) and not on the basis of a rule, emphasizes what the fastidious might regard as the overblown character of the Elmbrook Church's religious imagery, in concluding that a public school cannot hold a graduation there. The opinion provides a virtual inventory of the religious objects in the church. If such details of a church's interior thus have dispositive constitutional significance, we shall in future cases have to assess the iconography of the churches that compete to rent space to a school or other public body, including an election board. (On the majority's view, could the auditorium of Elmbrook Church be used as a polling place? Since 18-year-olds have a constitutional right to vote, many voters are no older than graduating high school seniors.) All other objections to one side, a jurisprudence of church furnishings ("requiring scrutiny more commonly associated with interior decorators than with the judiciary," *American Jewish Congress v. City of Chicago*, 827 F.2d 120, 129 (7th Cir. 1987) (dissenting opinion)), inevitably favoring iconoclastic churches, would be inconsistent with governmental neutrality among sects.

And finally, returning to an earlier point, isn't it about time that constitutional cases were decided on the basis of evidence rather than conjecture ("everyone knows") and doubtless in many cases bias? Is there any evidence, as distinct from conjecture and intuition, that the exposure

of high school students to the interior of a church—any church—has any effect on religious beliefs or observances? The great David Hume favored established churches on the ground that monopoly breeds indolence, and so an established church would dampen religious strife. Until the *Schempp* decision in 1963 prayer was common in public schools in many parts of this country, yet religion had less salience in the public sphere than it has today. Separation rulings by the Supreme Court seem only to stimulate religious fervor. Religions thrive on persecution, real or imagined. Where would Christianity be without its martyrs? The real winner of this case is likely to be—Elmbrook Church.